## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

TERESA DEION SMITH HARRIS,    )
Tennessee Department of Corrections  )
Inmate Number 00233590      )
                     )
     Petitioner,         )
v.                        )      NO. 3:02-0021
                     )      JUDGE HAYNES
CHERRY LINDAMOOD, Warden   )
Tennessee Prison for Women,    )
                     )
     Respondent.       )

## M E M O R A N D U M

Petitioner, Teresa Deion Smith Harris, filed her pro se petition under 28 U.S.C. § 2254,

seeking to vacate her state court conviction for first degree felony murder for which she received

a life sentence without parole. The Court granted Petitioner's motion for appointment of counsel

and appointed the Federal Public Defender to represent Petitioner. In her amended petition[1] filed

by her counsel, Petitioner asserts claims for violations of her rights under Fourth, Fifth, Sixth,

Eighth and Fourteenth Amendments. Petitioner's specific claims are, in essence:

    (1)    Petitioner is actually innocent;

    (2)    Petitioner's trial counsel were ineffective for their failure to prepare and
            present the "sole defense," i.e., diminished capacity and lack of intent,
            including Petitioner's fear of her co-defendants;

    (3)    Petitioner's statements to police officers were unconstitutionally obtained in
            violation of Miranda v. Arizona, 384 U.S. 436 (1966).

---

[1]The Federal Rules of Civil Procedure can apply in a habeas proceeding. Mayle v. Felix,
545 U.S. 644, 649 (2005) ; Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ.
P. 15 (a), the filing of an amended complaint supercedes the prior complaint. Clark v. Tarrant
County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to
supercede the pro se petition.

(4)     The state trial judge was biased against Petitioner and in favor of the police officer who testified at a pretrial suppression hearing;

(5)     Petitioner's trial counsel unreasonably and prejudicially failed meaningfully to address Petitioner's mental state and incompetence during critical proceedings;

(6)     Petitioner's life sentence without parole lacks a valid aggravating circumstance in violation of the Eighth and Fourteenth Amendments;

(7)     The trial court's refusal to instruct the jurors on facilitation of felony, deprived Petitioner of a defense in violation of the Eighth and Fourteenth Amendments;

(8)     The prosecutor's closing argument that "he who runs with the pack shares in the kill" violated Petitioner's due process right to a fair trial; and

(9)     Petitioner's trial court counsel were ineffective for their failure to request jury instructions on diminished capacity; and their failure to object to the state prosecutor argument that the jurors could have been victims.

(Docket Entry No. 35, Amended Petition).  In support of these claims, Petitioner asserts factual contentions, id. Attachment thereto, Volumes I through III and present some claims that are based upon unsuccessful claims in earlier state court proceedings, but recast or reformulated them here as distinct and separate claims.

On January 7, 2002, the Respondent filed a motion to dismiss based upon the procedural default doctrine.  (Docket Entry No. 4).  In response, Petitioner filed a motion to hold her federal petition in abeyance to allow her to move to re-open her state post-conviction proceeding.  (Docket Entry No. 11).  The Magistrate Judge granted that motion on June 5, 2002 (Docket Entry No. 14). After a status conference on December 17, 2002,  this Court administratively closed this action without prejudice and with the right to reopen.  (Docket Entry No. 20).  On October 1, 2003, Petitioner gave notice of the resolution of the state court proceedings.  (Docket Entry No. 22).  The Court reopened the action and gave Petitioner thirty (30) days to file an amended petition.  (Docket

2

Entry No. 23).

Beginning on October 27, 2003, Petitioner's counsel filed several motions to extend the time to file an amended petition (Docket Entry Nos. 26, 28, 30 and 32) that the Court granted. (Docket Entry Nos. 27, 29, 31, 33 and 34). Petitioner's last amended petition was filed on March 26, 2004. (Docket Entry No. 35). In her answer to the amended petition, Respondent challenges the timeliness of some of Petitioner's claims and argues that except for claims actually decided by the state courts, Petitioner remaining claims are untimely and procedurally defaulted. (Docket Entry No. 39, Answer at pp. 7-16).

## A. Review of the State Record

### 1. Procedural History

Harris was convicted by a jury of first degree felony murder and sentenced to life in prison without the possibility of parole. On her direct appeal, the Tennessee Court of Criminal Appeals affirmed her conviction and sentence. State v. Harris, No. 02C01-9412-CC-00265, 1996 WL 654335 (Tenn. Ct. Crim. App. Nov. 12, 1996). The Tennessee Supreme Court also affirmed her conviction and sentence. State v. Harris, 989 S.W.2d 307 (Tenn. 1999). Petitioner did not file a petition for the writ of certiorari in the United States Supreme Court.

On March 27, 2000, Petitioner filed her first state petition for post-conviction relief that after an evidentiary hearing, the trial court dismissed. On appeal, the Tennessee Court of Criminal Appeals affirmed. Harris v. State, No. W2000-02611-CCA-R3-PC, 2001 WL 892848 (Tenn. Crim. App. 2001), and the Tennessee Supreme Court denied her application for permission to appeal. Id. at p. 1. Petitioner did not apply for the writ of certiorari in the United States Supreme Court.

On May 3, 2002, Petitioner filed her motion to reopen her post-conviction petition in the

3

Henry County Circuit Court. By order dated January 21, 2003, the state trial court denied her motion as time-barred and also found Petitioner's substantive contentions to be meritless. (Docket Entry No. 40, Addendum No. 12 thereto). On March 5, 2003, the Tennessee Court of Criminal Appeals affirmed the Order denying the motion to reopen. Id. at Addendum No. 13, Order. Petitioner did not file application for permission to appeal to the Tennessee Supreme Court.

## 2. State Courts' Findings of Fact[2]

On her direct appeal, the Tennessee Supreme Court made lengthy factual findings that are as follows:

### [THE GUILT STAGE]

The defendant, Teresa Deion Smith Harris, was convicted of first degree felony murder. The evidence introduced at the guilt phase of the trial established that on July 30, 1993, the defendant, her live-in boyfriend, Walter Smothers, and a neighbor, Stacy Ramsey, spent the day at the defendant's house drinking tequila, whiskey, and beer, and smoking marijuana. Smothers was also taking Valium.

The defendant's ex-boyfriend, David Hampton called her home several times throughout the day. Smothers answered the telephone on one occasion and argued with Hampton. The conversation ended when Smothers and Hampton agreed to meet and fight. Later that evening, the defendant, Smothers, and Ramsey left to go to Hampton's house. Smothers asked Ramsey to bring along his .20 gauge shotgun.

The trio departed in Ramsey's pickup truck, and after leaving the defendant's two young children at their grandmother's home, they drove around Carroll County for sometime, drinking alcohol and searching for Hampton's house. The defendant testified that she knew the location of Hampton's house but was afraid to direct Smothers to it. At some point, they tried to buy motor oil for Ramsey's truck but could find no store open, so they continued the search for Hampton's house.

Eventually, at around 12:00 a.m., the truck broke down on Highway 114 near Hollow Rock. To obtain transportation, the defendant, Smothers, and Ramsey decided to stop the next vehicle that approached and take it from the driver. They discussed that they might be required to kill the driver of the vehicle. Smothers believed that an

[2]State appellate court opinion findings constitute factual findings in an action under 28 U.S.C. § 2254. Sumner v. Mata, 449 U.S. 539, 546-47 (1981).

4

approaching vehicle would be more likely to stop for a young woman, so he urged the defendant to flag down the vehicle. She agreed, and when the headlights became visible, Harris stood on the side of the road and flagged down the approaching vehicle while Smothers and Ramsey hid behind the truck.

The truck broke down less than one mile from Hampton's home.

The truck, a Ford Ranger, was driven by the victim, nineteen-year-old Dennis Brooks, Jr. He had just finished his shift at Subway and was traveling home at approximately 12:30 a.m. When Brooks stopped, Ramsey and Smothers emerged from their hiding place. Smothers held the .20 gauge shotgun on Brooks and ordered him to get out of his truck. Ramsey forced Brooks to lie on the ground, and the defendant ran up to Brooks, punched him two or three times in the back, cursed him, and told him to lie down on the ground. At trial, the defendant claimed that her actions were intended to force Brooks to be quiet so that Smothers would not harm him. However, according to nearby residents who were awakened by the commotion and heard the defendant shouting, the defendant's voice sounded "mean" and "very hateful."

Smothers demanded money from Brooks, took his wallet and forced him to get onto the back of the victim's pickup truck. The defendant and Ramsey got into the cab of the truck. Ramsey drove and, as the truck began to move, Smothers decided to climb into the cab of the truck through the rear sliding glass window. Smothers asked Ramsey to slow down and gave the gun to the defendant to hold on Brooks while he climbed through the window. Testimony diverged as to what happened next. Smothers said that while the defendant was still holding the gun, Ramsey accelerated, causing the truck to jerk and the gun to discharge and shoot the victim in the hip. In contrast, the defendant testified that she had given the gun back to Smothers, turned back around in the seat, and then heard the gun discharge and shoot the victim in the hip. According to the defendant, Smothers told her he had accidentally shot the victim. Ballistics testimony at trial indicated that to fire the gun which was used to shoot the victim, a person would have to both pull back the hammer and press the trigger.

In any event, after being shot, the victim began to scream and cry out in pain. Ramsey, Smothers, and Harris yelled at him to shut up. According to the defendant, Smothers initially agreed to take Brooks to a hospital but did not follow through on his promise, and instead the group continued to drive around in the country for another 20 or 30 minutes searching for Hampton's house. As lights from a town became visible, the victim again began to scream for help. Afraid someone would hear the screaming, Smothers put the gun under the victim's chin and fired. Smothers testified that Ramsey, the defendant, or a voice inside his head told him to shoot the victim.

5

After the fatal shooting, the trio continued to drive around in the area. While speeding through the town of Hollow Rock, they were pursued by a police officer, but were able to evade apprehension and eventually traveled back to the defendant's home. They discussed how to dispose of the victim's body and decided to bury his body and truck with a backhoe to which Ramsey had access. However, this plan had to be abandoned because the backhoe had a flat tire, so they decided to bury the victim's body and burn the vehicle.

Smothers obtained an ax and a shovel from Ramsey's home, and the defendant retrieved a butcher knife from her kitchen. Ramsey and Smothers drove the victim's truck to a deserted area known as Haunted Bridge. The defendant followed in her car. Once there, the group decided to dismember the victim's body to make burial easier and to give the impression that "nobody around here did it."

The medical examiner testified at trial that the victim had died from the gunshot wound to his head, but also stated that the gunshot wound to the victim's hip would have resulted in excruciating pain and alone would have been sufficient to result in death due to the tremendous amount of blood loss. The medical examiner also recounted the post-mortem mutilation of the victim's body, testifying that the victim had been stabbed numerous times and that his legs, right arm, and penis had been severed from his body. The victim's chest cavity had been cut open and his heart had been removed and placed back inside his abdominal cavity. The medical examiner testified that the victim's heart had discolored areas on it which were consistent with a person sucking blood from it.

According to Smothers, he and Ramsey each had severed one of the victim's legs and Ramsey had severed the victim's right arm. Smothers admitted that he had removed the victim's heart, but said he had done so because the defendant had told him that she "wanted his heart." Smothers said that he, Ramsey, and the defendant had each held the victim's heart and pressed it to their lips. The defendant admitted stabbing the victim's body once and touching the victim's heart to her lips, but she claimed that she had acted at Smothers direction and said that she had been afraid to disobey him after he had shot and killed the victim. The defendant otherwise denied all participation in the mutilation.

After mutilating the victim's body, the trio returned to the defendant's home, obtained gasoline and lantern fuel, and drove the truck into an empty field. After removing a radio, speaker and several personal items, they set the truck afire with the victim's mutilated body inside the cab. Ramsey and Smothers drove the victim's truck to the burn site with the defendant following in her own car. After the fire was ignited, they all returned to the defendant's home. They all showered and the defendant laundered their blood-stained clothes.

These items were recovered from the defendant's house after she consented to a

6

search.

The day after the night of the murder, the defendant and Smothers returned to the victim's truck and, discovering it had not completely burned, again set the truck afire. They concocted an alibi to conceal their actions and the events of the previous night. Later that evening the three "partied" at Ramsey's house until around 8:00 p.m. and then went to an establishment called Casey's Bar and continued to consume alcohol. According to the owner of the Bar, the defendant was "more active" than usual. She played pool and sang with the jukebox. She was wearing a hat and sunglasses which were later identified as belonging to the victim.

The victim's parents had reported him missing on the afternoon of July 31, 1993, the day following the murder. While searching for the victim with a helicopter, law enforcement officials spotted the smoke from his burning truck. An investigation followed, and rather quickly, law enforcement officials arrested Ramsey, Smothers, and the defendant. All three were indicted and charged by a Carroll County grand jury in a two count indictment with premeditated first degree murder and first degree felony murder. The State filed a notice of intent to seek the death penalty as to each defendant.

Upon request, the trial court severed the action and ordered three separate trials. The defendant was tried first. The venue was changed due to the magnitude of pretrial publicity. The defendant's trial was held in Henry County. At the end of the proof, the State elected to proceed on the charge of first degree felony murder charge. Upon hearing the proof as summarized above, the jury found the defendant guilty of first degree felony murder.

## [SENTENCING STAGE]

At the sentencing hearing, the State sought the death penalty upon the basis of two aggravating circumstances: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn.CodeAnn. §39-13-204(i)(5) and (6) 1997 Repl.). Repl.). The State relied upon the evidence presented at the guilt phase of the trial. The State also called as a witness the victim's father, who asked the jury not to impose the death penalty, but to impose instead a sentence of life imprisonment without the possibility of parole.

The defendant testified in her own behalf and also offered the testimony of Cynthia Taylor, her sister, Dr. Phillip Carl Morson, a staff physician from Western Mental Health Institute, and Dr. Gillian Blair, a clinical psychologist. The defendant expressed sorrow to the victim's family for the murder and said that she would not have stopped his truck if she had known it would eventually result in his death.

7

From the testimony of the defendant's sister, the jury learned that the defendant, twenty-three at the time of trial, is the middle child in a family of three, with an older sister, Taylor, twenty-eight at the time of trial, and a younger brother, eighteen at the time of trial. The defendant's father was employed as a school bus driver in Carroll County and also owned a small engine shop. Her mother had suffered from severe rheumatoid arthritis since shortly after the defendant's birth, and at the time of trial was unable to walk without crutches. Because of her mother's illness, the defendant's grandmother had cared for her a great deal until the grandmother was killed in an automobile accident when the defendant was twelve-years-old. The defendant had begun drinking alcohol shortly after her grandmother's death and had become an alcoholic.

> 3 Taylor also testified that the defendant had been sexually abused since the age of twelve, but because Taylor did not wish to disclose the identity of the abuser, defense counsel did not pursue this line of questioning.

Though the defendant has repeatedly sought treatment, she has been unable to successfully control the addiction. The defendant also abuses drugs, including morphine and cocaine. At the age of fourteen, the defendant attempted to commit suicide by taking an overdose of Tylenol and, as a result, was hospitalized for treatment. The defendant became pregnant and bore her first child while she was enrolled in high school. She was able to utilize a homebound teacher to stay current on her studies. Eventually the defendant returned to classes and graduated even though she continued to use drugs and alcohol.

Following graduation, the defendant again became pregnant and married Jim Harris. The defendant and Harris abused drugs regularly during their marriage which eventually ended in a divorce. Thereafter, the defendant met and dated David Hampton for approximately one year. Hampton abused drugs and also physically abused the defendant. On one occasion, the defendant was hospitalized as a result of the abuse. When her relationship with Hampton ended, the defendant began dating Smothers. They had lived together for approximately two to three weeks before this killing occurred.

On cross-examination Taylor admitted that the defendant had been rebellious since the age of twelve, that she would not listen to the instruction of her parents, and that she has made very poor choices with regard to relationships with men. Taylor said that both she and her mother had tried to help the defendant "in every way" by seeking professional help but that none of their efforts had been successful.

Dr. Morson, a staff physician at Western Mental Health Institute, testified that he had treated the defendant beginning on January 15, 1994, after she had attempted to

commit suicide while incarcerated for the victim's murder. At that time, the defendant was diagnosed as suffering from major depression with psychotic features and post-traumatic stress disorder, with post-traumatic stress disorder being the primary diagnosis. According to Dr. Morson, the traumatic event which precipitated the onset of the defendant's post-traumatic stress disorder was her witnessing and participation in the victim's murder. In her admission statement, the defendant had said "I'm going to kill myself. I don't deserve to live after what I did."

Dr. Morson described the defendant as "a very anxious person, a very guilt-ridden person, a very distraught person, a person who was... re-experiencing the events of last summer, was actually at times feeling like the deceased was in the room with her, was hearing his voice begging; and was driven to just extreme anxiety about this, driven to suicidal attempts by this, driven to not want to be alive by this, over and over again, driven to the point where at times she was so distracted that she was almost not there." Dr. Morson said the defendant would cry and twist her hair each time the subject was brought up and felt extremely guilty "because she could not stop the events that happened; that she could not stop Walter [Smothers] from doing what he did; that she didn't have the courage to do anything about this..." The defendant expressed remorse and regret for her actions, according to Dr. Morson, and repeatedly stated that "she didn't know how she could go on living with this." She also attempted to commit suicide on one occasion while hospitalized at Western State.

Dr. Blair stated that the defendant had reported to her that she had been raped and had been sexually abused by the rapist since the age of twelve. The defendant reported the abuse to her parents but was not believed. According to the defendant's statement, the alleged perpetrator later admitted the abuse but was never prosecuted. Following the rape, Dr. Blair said the defendant began using various drugs and attempted suicide multiple times. Dr. Blair opined that the defendant participated in the murder of the victim because she is dependent upon men and, as a result, followed the directions of Walter Smothers.

On cross-examination, Dr. Blair admitted that any post-traumatic stress that the defendant now suffers would not have impacted her actions on the night of the murder, July 30, 1993. Also, Dr. Blair conceded that the defendant's noncompliance with her parents' instructions could be considered inconsistent with her assessment of the defendant as a dependent personality.

989 S.W.2d at 309-13. (emphasis added).

As pertinent here, on Harris's direct appeal, the Tennessee Court of Criminal Appeals made the following factual findings:

9

<u>Testimony indicated that appellant was an active participant in the events leading up to the victim's murder.</u> Appellant began the whole ordeal when she stopped Brooks in the road that night. She admitted that afer Ramsey threw Brooks onto the ground, she hit him in the back several times and cursed him. In addition, she kept the gun trained on Brooks as he lay in the back of the truck. Although she denies having control of the gun when the first shot went off, Smothers testified that the first shot into Brooks' hip occurred while appellant was holding the gun on him<u>. Appellant was clearly more than a mere facilitator.</u> Where the record clearly shows that the defendant was guilty of the greater offense, it is not error to fail to charge the jury on a lesser offense.

\* \* \*

### 12. SUPPRESSION OF STATEMENT

Appellant maintains in her twelfth issue that the trial court committed error in denying the motion to suppress her statement. Appellant alleges that law enforcement officials failed to timely administer <u>Miranda</u> warnings and that her statement was involuntarily given. Purportedly, this rendered her statement inadmissible. The focus of the appellant's lengthy argument here is on the determination of "custodial interrogation." Finding no error by the trial court on the motion, we uphold its ruling.

\* \* \*

The totality of the circumstances surrounding appellant's statement do not lend themselves to a conclusion of custodial interrogation. Officials went to appellant's home the day after the murder. They were led to her based upon information given by co-defendant Stacy Ramsey. The officers went to appellant's house, asked to speak with her and talked with appellant on her front porch. The time was around 9:30 or 10:00 a.m. The questioning lasted approximately an hour. The TBI agent who questioned appellant stated that he spoke with her in a normal tone of voice and that he was not "smart" with her. He made the statement that "now was the time for her to talk." Appellant was not transported to the police station, but rather permitted to remain at her own home. There were four law enforcement officials present, but two of them were questioning Smothers inside the house. Appellant was not confined; she was permitted to move to the front porch from inside when she expressed a fear that Smothers would hear what she had to say. No one indicated that she was not free to leave. At the first mention of incriminating statements, the officers administered Miranda warnings. Under a totality of the circumstances, these facts are more than sufficient to support the trial judge's ruling on this motion. The trial court is especially suited to make this factual inquiry, Anderson, slip op. at 10, and we find no error. The record also supports the ruling that the statement was voluntarily given. Appellant's issue has no merit.

Id. at 4, 12-13.

In her state post-conviction petition, Harris presented claims of newly discovered evidence based upon Smothers's letter recanting his trial testimony and ineffective assistance of counsel, Harris, 2001WL 892848 at 1. The Tennessee Court of Criminal Appeals found and concluded as follows:

> At the post-conviction hearing, the petitioner offered an undated letter written to her from her accomplice, Walter Steve Smothers, which recanted the portion of his trial testimony that implicated the petitioner. However, at the post-conviction hearing, Smothers recanted the statements he made in the letter. He explained that the letter "served its purpose... to get a ride. I ain't ever getting out of prison. I figured if somebody knew this, I might get a chance to come to court, see the countryside."
>
> The post-conviction court properly rejected the petitioner's "newly discovered evidence," Firstly, recanted testimony amounts to no more than a request to relitigate the sufficiency of the evidence at trial and is not a proper subject of post-conviction relief. Charles Haynes v. State, C.C.A. No 01C01-9803-CC-00142, 1999 WL 126661, at *2 (Tenn.Crim.App. filed March 11, 1999 at Nashville), perm. to app. denied (Tenn. 1999) (citations omitted). Secondly, at the post-conviction hearing Smothers affirmed his trial testimony and denied the truth of the facts set forth in the letter. This issue is without merit.
>
> * * *
>
> Petitioner asserts she received ineffective assistance of trial counsel due to their failure to object to an incomplete aggravating circumstances reported by the jury.
>
> * * *
>
> At the post-conviction hearing, the petitioner's trial attorney testified that they made a conscious tactical decision not to object to the incomplete aggravating circumstances. They testified that had they objected, the trial court would have simply sent the jury back to make a complete finding. Accordingly, they thought that raising the issue on direct appeal was the best course of action.
>
> Tactical decisions by counsel are generally not proper subjects of post-conviction relief. Henley, 960 S.W.2d at 579. Regardless, we conclude the petitioner failed to prove prejudice. On direct appeal, the Supreme Court of Tennessee noted that the petitioner advanced no specific argument demonstrating that the jury grossly abused its discretion of imposing a sentence of life without the possibility of parole simply

11

because the jury relied upon the incomplete aggravating circumstances. Harris, 989 S.W.2d at 317. We similarly conclude in this post-conviction matter that petitioner has failed to establish a reasonable probability that the sentence would have been any different had counsel objected and the jury redeliberated. See Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. This issue is without merit.

Id. at 1, 2-3. (emphasis added).

In his Order denying Petitioner's motion to reopen, the state trial court judge who presided over Petitioner's trial, made the following factual finding:

The Court is constrained to observe that within the various pleadings filed in support of this motion there is to be found a subtle selection of certain facts, an ignoring of others, and self-serving conclusionary statements based upon purported facts, all of which could leave one unfamiliar with this matter with the impression that the movant was a victim in this case. This is not only grossly incorrect, but patently untrue. The facts of this case reveal an incredibly obscene crime that would not and indeed, could not have occurred without knowing and willing participation, if not leadership, of the movant at every significant stage.

(Docket Entry No.40, Addendum No. 12 thereto at p. 4). (emphasis added).

### 3. Petitioner's Claims in the State Court

In her direct appeal to the Tennessee Court of Criminal Appeals, Petitioner presented the following claims:

1. DID THE INDICTMENT PROPERLY CHARGE THE OFFENSE FOR WHICH THE DEFENDANT WAS TRIED?

2. INASMUCH AS T.C.A. § 39-11-402 (CRIMINAL RESPONSIBILITY FOR CONDUCT FOR ANOTHER) WAS CHARGED TO THE JURY; SHOULD THE PROVISIONS OF T.C.A. § 39-11-403 (CRIMINAL FACILITATION) HAVE BEEN CHARGED AS A LESSOR INCLUDED OFFENSE?

3. WAS THE ADMISSION OF POST DEATH FACTS AS TO TREATMENT OF THE BODY OF THE DECEASED ERROR AND DENY THE DEFENDANT A FAIR TRIAL?

4. DID THE COURT PROPERLY SENTENCE YOUR DEFENDANT TO LIFE WITHOUT PAROLE IN THAT:

12

A.  The first aggravating factor as stated by the jury (heinous, etc.) was improper in that all elements to be an aggravating were not found to exist; and/or

B.  The second aggravating factor found by the jury subjects your defendant to double jeopardy in that this aggravating factor is inherit in the offense for which the jury found the defendant guilty; and/or

C.  The trial court failed to send the jury back to deliberate further based upon their announced and clearly erroneous findings.

5.  DID THE TRIAL JUDGE COMMIT PREJUDICIAL ERROR IN REQUIRING THE DEFENDANT TO SELECT HER JURY AND EXERCISE HER PEREMPTORY CHALLENGES IN A MANNER CONTRARY TO THE PROCEDURE SET OUT IN RULE 24 OF THE TENNESSEE RULES OF CRIMINAL PROCEDURE?

6.  DID THE COURT ERR IN ALLOWING THE JURY TO CONSIDER THE AGGRAVATING CIRCUMSTANCE AS LISTED IN T.C.A. § 39-13-204(i)(5) (THAT THE MURDER WAS ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL IN THAT IT INVOLVED TORTURE OR SERIOUS PHYSICAL ABUSE BEYOND THAT NECESSARY TO PRODUCE DEATH) IN THAT THERE WAS NO EVIDENCE WHICH COULD SUBSTANTIATE THIS AGGRAVATING CIRCUMSTANCE AND FURTHER THAT IT WAS UNCONSTITUTIONALLY VAGUE AS APPLIED TO THE FACTS OF THIS CASE?

7.  DID THE COURT ERR IN ALLOWING THE JURY TO CONSIDER THE AGGRAVATING CIRCUMSTANCES AS LISTED IN T.C.A. § 39-13-204(i)(6) (AVOIDING, INTERFERING WITH OR PREVENTING AN ARREST OR PROSECUTION) IN THAT THIS AGGRAVATING CIRCUMSTANCE AS APPLIED TO THE FACTS OF THIS CASE IS UNCONSTITUTIONALLY VAGUE AND FAILS TO LIMIT THE CLASS CHARGED?

8.  DID THE COURT ERR IN NOT DISMISSING INDICTMENT NUMBER 93CR-561 DUE TO THE ILLEGALITY AND UNCONSTITUTIONALITY OF T.C.A. § 39-13-202(2) AS APPLIED TO THE FACTS OF THIS CASE AND WHEN CONSIDERED IN CONJUNCTION WITH T.C.A. § 39-11-101 and § 39-11-102?

9.  DID THE IMPROPER COMMENT BY THE PROSECUTION DURING CLOSING ARGUMENT OF THE GUILT PHASE OF THE TRIAL AFFECT THE VERDICT OF THE JURY TO THE PREJUDICE OF THE DEFENDANT?

10.  DID THE IMPROPER ARGUMENT OF THE STATE DURING THE

13

PENALTY PHASE LEAD TO AN ARBITRARY AND UNRELIABLE SENTENCE IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION EIGHT AND SIXTEEN OF THE TENNESSEE CONSTITUTION?

11. DID THE TRIAL COURT JUDGE ERR IN NOT RECUSING HIMSELF DUE TO HIS PARTIALITY TOWARD A MATERIAL STATE'S WITNESS, SPECIAL AGENT ALVIN DANIELS, WHO HEADED UP THE INVESTIGATION IN THIS CASE?

12, DID THE TRIAL COURT ERR IN FAILING TO SUPPRESS ALLEGED STATEMENTS MADE BY THE DEFENDANT IN THAT THEY WERE INVOLUNTARY AND/OR WERE MADE PURSUANT TO AN ILLEGALLY OBTAINED PRIOR STATEMENT AND/OR WERE OTHERWISE UNCONSTITUTIONALLY OBTAINED?

13. DID THE HONORABLE TRIAL JUDGE DENY CERTAIN CITIZENS THEIR RIGHT TO SERVE ON THIS JURY BASED UPON THEIR INABILITY TO IMPOSE THE DEATH PENALTY ATTRIBUTABLE TO THEIR RELIGIOUS BELIEFS?

(Docket Entry No. 7, Addendum No. 1 at Appellant's Brief pp. 2-3).[3]

---

[3] The Tennessee Court of Criminal Appeals restated these claims as follows:

(1) the indictment was improper because it failed to charge the appellant with criminal responsibility where the judge instructed the jury on this accomplice liability;

(2) since the jury was instructed on the law regarding criminal responsibility, criminal facilitation should have been charged as a lesser included offense;

(3) the admission of post-death facts was error and denied the appellant a fair trial;

(4) the trial court improperly sentenced the appellant to life without parole for three reasons:

    (a) the failure of the jury to completely fill in the verdict form with all the elements of the first aggravating factor;

    (b) the second aggravating factor found by the jury subjects appellant to double jeopardy because it is inherent in the offense; and

    © the trial court failed to send the jury back to deliberate further upon their announced erroneous findings;

(5) the trial court conducted voir dire in a manner inconsistent with Rule 24 of the Rules of Criminal Procedure;

(6) the trial court erroneously allowed application of the "especially heinous, cruel or atrocious" aggravating factor;

(7) the trial court erroneously allowed application of the "avoiding, interfering with or preventing an arrest or prosecution" aggravating factor;

(8) the trial court erred in allowing the district attorney to exercise his discretion to pursue a charge of first degree murder;

(9) the district attorney made improper comment during closing statement of the guilt phase;

(10) the district attorney made improper comment during closing argument at the sentencing phase;

(11) trial judge erred in not recusing himself due to partiality towards a State's witness;

(12) the trial court erred in failing to suppress statements made by appellant; and

(13) the trial court denied certain citizens their right to serve on a jury based on their religious reservations about imposing the death penalty.

14

In her direct appeal, Petitioner's application to the Tennessee Supreme Court narrowed her claims to a single claim.

> A PARTIAL FINDING OF AN AGGRAVATING CIRCUMSTANCE BY THE JURY CANNOT BE USED TO ENHANCE A SENTENCE FOR FIRST DEGREE MURDER TO LIFE WITHOUT THE POSSIBILITY OF PAROLE.

Id. at Addendum No. 3, at p. 6.

On the issue of the jury's incomplete verdict on one of the aggravating factors upon which Petitioner's sentence was based, the Tennessee Supreme Court concluded:

> For the reasons previously explained, we conclude that the incomplete finding as to the aggravating circumstances constitutes statutory error which, in this case, is harmless because the defendant failed to establish that the jury grossly abused its discretion by arbitrarily imposing a sentence of life imprisonment without the possibility of parole. Accordingly, the judgment of the Court of Criminal Appeals which upheld the defendant's conviction and sentence is affirmed.

998 S.W.2d at 318.

In her post-conviction proceeding, Petitioner raised a myriad of claims before the trial court. (Docket Entry No. 7 at Addendum No. 8, at pp. 4-5). Yet, on her first post-conviction appeal, Petitioner raised only two claims: "(1) Was the Appellant's trial counsel ineffective for failing to object in the trial in this cause to the jury having an incomplete finding of the aggravating factor and further failing to request the Court to order the jury to continue deliberation on the issue?; and (2) Was the Court in error in failing to consider the newly discovered evidence, to wit, a letter from a co-defendant recanting his trial testimony, in considering the Petitioner's Petition for post-conviction relief? Id. at p. 2.

In her application for permission to appeal, with new counsel, Petitioner presented the

---

Harris, 1996 WL 65435 at *1.

15

following claims:

 I. Whether Petitioner Harris' trial counsel was constitutionally ineffective in both the guilt and penalty phase, depriving her of a fundamentally fair trial based on the below-enumerated specific deficiencies

  A. Trial counsel's failure to object to (or appeal under the plain error standard) the State's prosecutorial misconduct in improperly suggesting that the jury panel should envision itself in the place of the victim

  B. Trial counsel's failure to object to (or appeal under the plain error standard) the State's improper comment in closing argument that the lead investigator knew more about the case than he revealed to the jury

  C. Trial counsel's failure to explore or raise a diminished capacity defense during the guilt phase

  D. Trial counsel's failure to interview critical State witnesses, specifically including the only unindicted eye-witness to the crime

  E. Trial counsel's failure to explore and address the actual conflict of interest of the victim's family's lawyer

  F. Trial counsel's failure to appeal the trial court's erroneous decision not to charge all of the lesser-included offenses of felony murder

  G. Trial counsel's conscious and deliberate failure to object to the jury finding an incomplete aggravating factor or to request further deliberation during the penalty phase

 II. Whether cooperating co-defendant Walter Smothers' post-trial statements recanting his trial testimony constitute newly discovered evidence sufficient to call into question the integrity of the verdict, since the State's use of his perjured testimony was material and constituted a violation of due process.

(Docket Entry No. 7, Addendum No. 10 thereto at pp. i, ii). Petitioner also filed an alternate motion

to vacate and remand. (Docket Entry No. 11, Attachment B thereto). In denying her application

to appeal, the Tennessee Supreme Court also denied Petitioner's motion to remand and vacate.

(Docket Entry No. 7, Addendum No. 11, Order at p. 1).

 In her motion to reopen the state post-conviction proceedings, Petitioner presented only state

16

law claims:

> Petitioner relies upon <u>State v. Phipps</u>, 883 S.W.2d 138 (Tenn. Crim. App. 1994) and
> <u>State v. Ely</u>, 48 S.W.3d 710 (Tenn. 2001) respectively.

* * *

> The two cases relied upon by Petitioner did not create new rules of constitutional
> law.

* * *

> For the reasons set forth herein, we conclude that Petitioner's claim that her
> motion is based upon new constitutional rules of law is not well-taken.

(Docket Entry No. 40, Addendum No. 13 thereto at pp. 1, 2).

### C. Conclusions of Law

### 1. Petitioner's Request for an Evidentiary Hearing

Of the issues before the Court, the threshold issue is whether to conduct an evidentiary

hearing. In conclusory statements in her brief in support of the petition, Petitioner requests an

evidentiary hearing without any analysis of any facts that show such a hearing is necessary. (Docket

Entry No. 54 at pp 1, 39 and 64). In the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 110 Stat. 1214, Congress redefined the standards for conducting an evidentiary hearing

in a habeas action in amending Section 2254 to provide as follows:

> If the applicant has failed to develop the factual basis of a claim in State court
> proceedings, the court shall not hold an evidentiary hearing on the claim unless the
> applicant shows that - (A) the claims relies on - (i) a new rule of constitutional law,
> made retroactive to cases on collateral review by the Supreme Court, that was
> previously unavailable; or (ii) a factual predicate that could not have been previously
> discovered through the exercise of due diligence; and (B) the facts underlying the
> claim would be sufficient to establish by clear and convincing evidence that but for
> constitutional error, no reasonable fact-finder would have found the applicant guilty
> of the underlying offense.

28 U.S.C.§ 2254(e)(2).

17

In <u>Williams v. Taylor</u>, 529 U.S. 420 (2000), the Supreme Court stated that under Section

2254(e)(2), the initial focus on whether to conduct an evidentiary hearing, is whether the petitioner

exercised diligence in developing the state record and that diligence depends, in part, on whether

the petitioner or his counsel knew of the matters at issue and failed to pursue the matter in the state

courts:

> The question is not whether the facts could have been discovered but instead whether
> the prisoner was diligent in his efforts . . . <u>Diligence for purposes of the opening
> clause [of Section 2254(e)(2)] depends upon whether the prisoner made a reasonable
> attempt, in light of the information available at the time, to investigate and pursue
> claims in state court</u>; it does not depend, as the Commonwealth would have it, upon
> whether those efforts could have been successful.
>
> &ast; &ast; &ast;
>
> For state courts to have their rightful opportunity to adjudicate federal rights, <u>the
> prisoner must be diligent in developing the record and presenting, if possible, all
> claims of constitutional error.  If the prisoner fails to do so, himself or herself
> contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2)
> prohibits an evidentiary hearing to develop the relevant claims in federal court,
> unless the statute's other stringent requirements are met.  Federal courts sitting in
> habeas are not an alternative forum for trying facts and issues which a prisoner made
> insufficient effort to pursue in state proceedings.</u>
>
> &ast; &ast; &ast;
>
> Given knowledge of the report's existence and potential importance, a diligent
> attorney would have done more.  Counsel's failure to investigate these references in
> anything but a cursory manner triggers the opening clause of § 2254(e)(2).

<u>Id.</u> at 435, 437 and 439-40 (emphasis added).

Independent of § 2254(e)(2), the Court possesses the inherent authority to set an evidentiary

hearing in a habeas action.  <u>Harries v. Bell</u>, 417 F.3d 631, 635 (6th Cir. 2005); <u>Abdur'Rahman v.

Bell</u>, 226 F.3d 696, 705-06 (6th Cir. 2000).  "[A] district court does have the inherent authority to

order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent." <u>Abdur'

Rahman</u>, 226 F.3d at 705.  Such hearings are set "to settle disputed issues of material fact." <u>Id.</u> at

18

706.  This authority extends to where an inadequate record exists to decide a procedural default controversy.  Alcorn v. Smith, 781 F.2d 58, 60 (6th Cir. 1986).

Yet, "[i]f [the court] concludes that the habeas applicant was afforded a full and fair hearing by the state court resulting in reliable findings,[the court] may, and ordinarily should accept the facts as found in the hearing.  But [the court] need not.  In every case [the court] has the power, constrained only by [its] sound discretion, to receive evidence bearing upon the applicant's constitutional claim." Abdur'Rahman, 226 F.3d at 705 (quoting Townsend v. Sain, 372 U.S. 293, 318 (1963)).  Even prior to AEDPA, a habeas petitioner had to show cause for his failure to develop the state record or  that "a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing," Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992).  Moreover, the Supreme Court has stated that: "The state court is the most appropriate forum for resolution of factual issues in the first instance and creating incentives for the deferral of fact-finding to later federal court proceedings can only degrade the accuracy and efficiency of judicial proceedings." Id. at 9.  Accord Byrd v. Collins, 209 F.3d 486, 516-17 (6th Cir. 2000) (quoting Keeney).

In a word, the distinction between § 2254(e)(2) and the Court's inherent authority to order an evidentiary hearing is whether "a petitioner is entitled to a hearing [under § 2254(e)(2)] . . . versus whether a district court has the inherent discretion to order a hearing [that] is still intact following Williams." Abdur'Rahman, 226 F.3d. at 706.

In her brief, Petitioner does not address the justification for a hearing on her claims. Petitioner had a state post-conviction evidentiary hearing to explore all issues about her trial.  Harris, 2001 WL 892848 at *1.  Petitioner attached to her amended petition, three volumes of documents that all principally involve her medical condition and history.  As quoted supra at pp. 7-9, Petitioner

19

presented proof of this medical and personal history at her sentencing hearing. Most of Petitioner's factual allegations about the state court proceedings are based on the state record. As discussed infra, some of these factual allegations are at variance with the state record and her attachments. The Court concludes Petitioner has not established the necessity for an evidentiary hearing on her petition under 28 U.S.C.§ 2254(d) nor made a sufficient showing to invoke the Court's inherent authority.

### 2. Respondent's Timeliness Challenge

The second major issue is the Respondent's contention that most of Petitioner's claims in her amended petition are time-barred under 28 U.S.C. § 2244(d)(1), AEDPA's one year limitation period. In particular, Respondent argues that Petitioner's original federal habeas petition did not include the following claims: Petitioner's Miranda claim, (Docket Entry No. 39, Respondent's Answer at p. 11); Petitioner's claim about the trial judge's alleged bias, id. at p. 13; Petitioner's claim for ineffective of counsel for trial counsel's failure to address Petitioner's mental state and incompetence at a suppression hearing, id. at pp. 15-16; Petitioner's claim that her sentence was based upon an invalid aggravating circumstance, id. at pp. 16-17; Petitioner's claim about her counsel's failure to object to the prosecutor's argument about a pack sharing in the kill, id. at p. 19; and Petitioner's claim of ineffective counsel for her counsel's failure to request jury instruction on diminished capacity, id. at p. 21.

In response, Petitioner contends that these claims in her amended petition are timely under the relation back doctrine under Rule 15(c); that her original petition put the Respondent on notice of these claims in her amended petition; and that Petitioner's actual innocence warrants tolling the limitations period for these claims. (Docket Entry No. 47).

20

Under 28 U.S.C. Section 2244(d)(1), a person convicted in state court has one (1) year from the time the conviction becomes final on direct appeal to file a federal petition. Yet, under 28 U.S.C. § 2244(d)(2), "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitations under this subsection." Id. (emphasis added).

The Tennessee Supreme Court affirmed Petitioner's conviction on April 12, 1999. Harris, 989 S.W.2d at 307. Petitioner did not seek certiorari in the United States Supreme Court and under Abela v. Martin, 348 F.3d 164, 172-73 (6th Cir. 2003) (en banc), the one year period would have been tolled for that the ninety (90) days period until July 12, 1999. Yet, in light of Lawrence v. Florida, ___U.S.___, 127 S. Ct. 1079, 1081 (2007) that time period is no longer tolled. Petitioner filed her state post-conviction petition on March 27, 2000. (Docket Entry No. 7, Addendum No. 7 at p.1). By that time 348 days had expired on the one year limitation period under Section 2244(d)(2). The limitation period was also tolled during Petitioner's state post-conviction proceeding. The Tennessee Court of Criminal Appeals affirmed the dismissal of Petitioner's post-conviction on August 3, 2001. Id. at Addendum No. 9 at p. 1. The Tennessee Supreme Court denied Petitioner's application to appeal on December 17, 2001. Id. at Addendum No. 11. Petitioner filed this action on January 7, 2002. (Docket Entry No. 1, Petition at p. 1). At that time, an additional twenty (20) days had passed for a total of 368 days, so that when Petitioner filed this action, 368 days had expired. Thus, the Court concludes that Petitioner's claims in her original petition were not timely filed under Section 2244(d)(1). Yet, for judicial efficiency purposes, the Court addresses the remaining issues.

As to her claims in her amended petition, the Petitioner argues that on May 3, 2002, she filed

21

a motion to reopen the state post-conviction proceeding that is permitted under Tennessee law, citing then Tenn. Code Ann. § 340-30-217(a)(1). On March 5, 2003, the Tennessee Court of Criminal Appeals affirmed the denial of Petitioner's motion to reopen. Petitioner did not apply for permission to appeal to the Tennessee Supreme Court that must be filed within 60 days after entry of the lower court's judgment. Tenn. R. App. P. 11(b). On October 1, 2003, Petitioner filed a notice of resolution of the state court proceedings. After several extensions, Petitioner filed her amended petition in this action on March 26, 2004.

Between January 7, 2002, when this action was filed and May 3, 2002, the date of Petitioner's motion to reopen in the state court, an additional 116 days had past under § 2244(a)(1) for a total of 404 days. An additional 326 days passed from the date of the Tennessee Court of Criminal Appeals's order denying Petitioner's motion to seek review, May 4, 2003, to the date of the filing Petitioner's amended petition, March 26, 2004. Thus, consistent with Section 2244(d)(2), a total of 730 days past before Petitioner filed the claims in her amended petition.

First, as a governing principle, the pendency of a federal habeas action does not toll the limitation period for filing of a federal habeas petition. Duncan v. Walker, 533 U.S. 167, 181-82 (2001). Thus, none of the extensions to file an amended petition in this action can toll the limitations period in AEDPA. Under certain conditions, the relation back doctrine under the Fed. R. Civ. P. 15(c)(2) can apply in a habeas action, but only to the extent that its application does not conflict with the AEDPA limitation period. Mayle v. Felix, 545 U.S. 644, 649 (2005). As the Supreme Court stated in Mayle:

> An amended habeas petition, we hold, does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.

22

* * *

Habeas Corpus Rule 11 permits application of the Federal Rules of Civil Procedure in habeas cases "to the extent that [the civil rules] are not inconsistent with any statutory provisions or [the habeas] rules..." Section 2242 specifically provides that habeas applications "may be amended ... as provided in the rules of procedure applicable to civil actions."

* * *

If claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance.

* * *

So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order.

Id. at 650, 654, 662, 664 (emphasis in the original).

In her original habeas petition in this action,[4] Petitioner set forth the following claims and factual allegations:

A.    In violation of the Sixth and Fourteenth Amendments, trial and appellate counsel were ineffective:

(1)    for failing to object to or appeal the State's prosecutorial misconduct in closing argument;

Supporting Facts: First, on cross-examination of Petitioner, the State improperly suggested that any member of the jury panel could have been Petitioner's victim that evening.  In fact, the prosecutor listed some of the potential victims (himself, members of the jury or the gallery). The defense did not object.  Then, in its guilt phase closing argument, the State again submitted that Petitioner would have done this to anyone in the courtroom. The prosecutor then exclaimed that everyone had learned their lesson from this case, and there would be no more stopping to help stranded strangers. The prosecutor went on to argue the ensuing events of the brutal crime, including the dismemberment, mutilation, and cannibalism.

* * *

_____

[4]Consistent with Mayle, the Court quotes Petitioner's claims and operative facts for each claim, but not her argument.

23

In another instance of prosecutorial misconduct, the State argued in closing that its star law enforcement witness knew more than the was able to tell the jury. The clear implication was that the withheld information would have been even more incriminating than the edited version of the evidence it actually heard during the Agent's testimony. The prosecutor was asking the jury to ask itself what that evidence could have been. . . .

* * *

(2)    for failing to explore or present a defense, specifically a diminished capacity defense;

Supporting Facts: Trial counsel offered no defense to the charges. The defense simply cross-examined State witnesses (without a clear theory or direction), and rested exclusively on the ill-prepared testimony of Petitioner. Petitioner testified to her lifelong abuse. She claimed that she was unable to resist the dictates of her co-defendant. Despite the fact that Petitioner Harris' extreme subservience could have formed the basis of a diminished capacity defense to negate the mens rea (intent) for the underlying felony, the defense offered no supporting expert testimony nor did it request a diminished capacity jury instruction. After conviction and during the penalty phase, defense counsel explored mitigation evidence of her mental health. . .

(3)    for failing to interview critical State witnesses, specifically including the only unindicted eye-witness to the crime;

Supporting Facts: Trial counsel made no effort to interview cooperating co-defendant Walter Smothers. Then, they were satisfied with the representation of co-defendant Stacy Ramsey's lawyer that Ramsey's memory of the events was scarce and that he would invoke his Fifth Amendment privilege if called to testify. Based on these representations, Petitioner's trial counsel did not subpoena Ramey as a defense witness. Moreover, trial counsel did not interview key witness, David Hampton. Hampton's telephone conversation with Smothers triggered the events leading up to the crime. Most importantly, defense counsel did not interview the only unindicted eye-witnesses to the crime, Mr. Keith Noles and Ms. Johnnie Maria Noles. Due to defense counsel's poor witness preparation, they were unable to spot the State's flagrant distortion of the Noles' observation.

(4)    for failing to explore and address the actual conflict of interest of the victim's family's lawyer;

Supporting Facts: Well in advance of trial, Petitioner voiced her concern about her former lawyer, John Everett Williams (now Judge on the Tennessee Court of Criminal Appeals in the Western Section), representing the victim's family.

24

Petitioner shared confidences with Mr. Williams during the course of prior representation with him. Then, without consulting Petitioner Harris or seeking a conflict of interest waiver from her, Mr. Williams began representing the victim's family. As part and parcel of that representation, Mr. Williams advocated the family's wish for vindication of the prosecution. The recipient of the vindication was his former client, Petitioner. Despite Petitioner's concern about Mr. Williams actual conflict of interest in representing the victim's family, trial counsel refused to raise the issue. Appellate counsel also refused to address it.

\* \* \*

(5)     for failing to appeal the trial court's erroneous decision not to charge all of the lesser-included offenses of felony murder;

<u>Supporting Facts</u>: The Indictment alternately charged Petitioner with first degree felony murder and first degree premeditated murder. The State elected to proceed only on its theory of first degree felony murder. At the conclusion of closing argument in the guilt phase, the trial court instructed the jury on felony murder and the lesser-included offenses of second degree murder and voluntary manslaughter. However, the trial court refused to charge the jury on the lesser-included offense of facilitation. Defense counsel objected, but the trial court declared that, after hearing Petitioner's testimony, such an instruction was not warranted by the proof. Trial counsel abandoned the issue and did not address it on direct appeal despite the fact that the record was replete with evidence supporting a facilitation instruction.

(6)     for consciously and deliberately failing to object to the jury finding an incomplete aggravating factor or to request further deliberation during the penalty phase;

<u>Supporting Facts</u>: Trial counsel made a deliberate, tactical decision not to object to jury's finding of an incomplete aggravating factor in the penalty phase. On direct appeal, the Court of Criminal Appeals commented on defense counsel's failure to object. Clearly, it was improper for trial counsel to deliberately fail to object - seeing it as the best appellate issue.

\* \* \*

(7)     for failing to communicate with the defendant;

<u>Supporting Facts</u>: Trial counsel rarely visited or consulted with Petitioner prior to trial, and appellate counsel did not adequately confer with Petitioner during the direct appeal. Defense counsel repeatedly made derogatory comments to Petitioner about her sexual history (including her severe sexual abuse). The alienated Petitioner, informing her that communicating with her was of no benefit to them.

25

B. In violation of the Sixth, Eighth, and Fourteenth Amendments, appellate counsel failed to present any and all meritorious issues on direct appeal, including these cited supra;

Supporting Facts: See "supporting facts" for A(1), A(4), A(5), A(6) and A(7) as set forth above. Additionally, appellate counsel only briefed one (1) of the thirteen (13) issues raised in the Court of Criminal Appeals when proceeding to the Tennessee Supreme Court - neglecting the other twelve (12) issues.

C. In violation of the Sixth, Eighth, and Fourteenth Amendments, the prosecution engaged in improper arguments;

Supporting Facts: See "supporting facts" for A(1) as set forth above.

D. Jury instructions on "heinous, atrocious, or cruel" aggravating circumstance were unconstitutional and vague in violation of the Sixth, Eighth, and Fourteenth Amendments;

Supporting Facts: The instructions was erroneously stated by the court and erroneously interpreted by the jury as was best evidenced by the jury's finding of only part of the aggravator.

E. There was insufficient evidence to support the aggravating circumstances;

Supporting Facts: The pre-death facts in the case were insufficient to support the aggravating circumstances. The State improperly relied on post-mortem facts to establish the aggravating circumstances.

F. There was double-counting of a felony-murder circumstance, and improper application of that circumstance, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments;

Supporting Facts: The prosecution improperly relied on the same facts to establish both the felony murder and an "avoiding, interfering with, or preventing a lawful arrest or prosecution" aggravating circumstance. The State submitted that the victim was fatally shot during the commission of a robbery, theft or kidnapping. The State then relied on the exact same facts to establish that the murder was committed to "avoid[], interfer[e] with, or prevent[] a lawful arrest or prosecution." . . .

26

G. The prosecution used the perjured testimony of a cooperating co-defendant, in violation of the Fifth and Fourteenth Amendments;

Supporting Facts: Cooperating co-defendant Walter Smothers recanted his trial testimony. His recantation is axiomatic because, without Smothers testimony, Petitioner would not have been convicted of this crime....

H. Cooperating co-defendant Walter Smothers' post-trial statements recanting his trial testimony constitute newly discovered evidence...;

Supporting Fact: See "supporting facts" for H as set forth above.

6. Petitioner does not know what other issues need to be investigated and raised before the Court in support of her request for habeas corpus relief. She therefore requests that this Court appoint her counsel who can properly investigate and present all possible claims for relief in a comprehensive Petition for Writ of Habeas Corpus.

(Docket Entry No. 1, Original Petition at pp. 3-9).

From the Court's review, none of the factual allegations in the original petition remotely suggests a violation of Petitioner's Miranda rights nor a claim of judicial bias nor an independent claim for the prosecutor's closing argument about the pack sharing in the kill. Although some of those claims were raised in the State proceedings, supra at pp. 12-16, an obvious decision was made not to include those claims in the original federal petition that must satisfy the time limits in the AEDPA.[5]

The Court, however, finds that some factual allegations in the original petition are sufficiently related to qualify three claims under Mayle: (1) portions of Claim I in the amended petition, namely her counsel's ineffectiveness for failure to raise a diminished capacity defense and to request a diminished capacity instruction and for counsel's failure to object to the prosecutor's

_____

[5]Although signed pro se, the format and wording of the original petition, with blue book citations, is strikingly similar to the amended petition.

27

remark that the offense could have happened to any members of the jury that are factually related to Claim 2 in the original petition; (2) Claim IV in the amended petition for an invalid aggravating circumstance to support Petitioner's life sentence that bears a factual tie to Claim 6 in the original petition; and (3) Claim No. V in the amended petition that the trial judge failed to give a jury instruction on facilitation of a felony that has a related factual bases to the Claim 5 in the original petition.

The Court concludes that only these three claims in the amended petition have an adequate factual tie to the factual allegations and claims in the original petition to qualify under the <u>Mayle</u> standards for the relation back doctrine. To allow the other unrelated claims in her amended petition to proceed would circumvent the time limits in§ 2244(a)(1) and would offend the <u>Mayle</u> holding. Although these claims qualify under the relation back doctrine, these three claims remain subject to procedural default doctrine that is invoked by the Respondent and is separate issue discussed <u>infra</u>.

As to Petitioner's argument that her actual innocence tolls the AEDPA's limitations period, the Sixth Circuit has so held for a credible claim of actual innocence of the offense. <u>Souter v. Jones</u>, 395 F.3d 577, 589-90 (6th Cir.2005). The actual innocence doctrine applies in "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Murray v.Carrier</u>, 477 U.S. 478, 496 (1986). The reasoning is that "'[i]n appropriate cases', the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration,'" <u>Id.</u> at 495 (quoting <u>Engle v. Issac</u>, 456 U.S. 107, 135 (1982)). "The quintessential miscarriage of justice is the execution of a person who is entirely innocent. ... [T]he 'fundamental value determination of our

28

society [is] that is far worse to convict an innocent man than to let a guilty man go free.'" <u>Schlup</u> <u>v. Delo</u>, 513 U.S. 298, 324, 325 (1995) (quoting <u>In re Winship</u>, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)). The Sixth Circuit, however, has questioned whether the actual innocence doctrine applies to non-capital sentences. <u>See Ross v. Berghuis</u>, 417 F.3d 552, 557 (6th Cir. 2005).

Assuming this doctrine applies here, actual innocence doctrine falls into two categories, procedural and substantive. <u>Schlup</u>, 513 U.S. at 314. The substantive actual innocence claim is where the habeas petitioner's trial is error free, but the habeas petitioner presents proof that he is actually innocent of the offense, <u>id.</u>, citing <u>Herrera v. Collins</u>, 506 U.S. 390 (1993) or where the petitioner alleges that he is "actually innocent of the death penalty". 513 U.S. at 323, citing <u>Sawyer</u> <u>v. Whitley</u>, 505 U.S. 333, 336, 347 (1992). For this type of claim, there is an "extraordinary" standard of review", <u>id.</u> at 316. The Supreme Court explained that: "[T]he evidence of innocence would have had to be strong enough to make the execution "constitutionally intolerable' *even if* the conviction was a product of a fair trial." <u>Id.</u> (emphasis in the original). The phrase "'actual innocence' means factual innocence, not mere legal insufficiency." <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998).

The second type is the procedural "actual innocence" doctrine that rests upon constitutional claims that are otherwise barred for a procedural default and the lack of a showing of cause and prejudice. <u>Schulp</u>, 513 U.S. at 314. For the procedural actual innocence doctrine, the Supreme Court described a lesser burden of proof as follows:

> Accordingly, we hold that the <u>Carrier</u> "probably resulted" standard rather than the more stringent <u>Sawyer</u> standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.

> The <u>Carrier</u> standard requires the habeas petitioner to show that "a constitutional

violation has probably resulted in the conviction of one who is actually innocent." 477 U.S., at 496, 106 S.Ct., at 2649-2650. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under Sawyer. The Carrier standard thus ensures that petitioner's case is truly "extraordinary," McCleskey, 499 U.S., at 494, 111 S.Ct., at 1470, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.

Carrier requires a petitioner to show that he is "actually innocent." As used in Carrier, actual innocence is closely related to the definition set forth by this Court in Sawyer. To satisfy the Carrier gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.

Id. at 326-27 (footnotes omitted).

Petitioner's actual innocence contention falls under both the first and second categories. Petitioner argues that she is factually innocent given her mental condition, a substantive contention and that her trial counsel were ineffective, a procedural contention. The issue is whether in light of all of the evidence, Petitioner has satisfied the standards for the actual innocence doctrine to pursue her untimely claims.

Under this doctrine, the habeas petitioner must present new evidence of his innocence because, "[w]ithout any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." Id. at 316. "To be credible, such a claim requires the petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific, trustworthy eyewitness accounts or critical physical evidence- that was not presented at trial." Id. at 324. This "reliable new evidence" must be "so strong that a court cannot have confidence in the outcome of the trial," id. at 316, so that it is

30

"[m]ore likely than not that no reasonable juror would have found [petitioner] guilty beyond a reasonable doubt." Id. at 327.

In Schlup, the Supreme Court addressed the Court's responsibility in evaluating the "new reliable evidence":

> The Carrier standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the Carrier standard, we believe that Judge Friendly's description of the inquiry is appropriate: The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."
>
> * * *
>
> The meaning of actual innocence as formulated by Sawyer, and Carrier does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.
>
> ...[U]nder the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments. Second, and more fundamentally, the focus of the inquiry is different under Jackson than under Carrier. Under Jackson, the use of the word "could" focuses the inquiry on the power of the trier of fact to reach its conclusion. Under Carrier, the use of the word "would" focuses the inquiry on the likely behavior of the trier of fact.
>
> ....Under Carrier, in contrast, the habeas court must consider what reasonable triers of fact are likely to do. Under this probabilistic inquiry, it makes sense to have a probabilistic standard such as "more likely than not." Thus, though under Jackson the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under Carrier.

31

* * *

> In applying the <u>Carrier</u> standard to such a request, the District Court must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial. Obviously, the Court is not required to test the new evidence by a standard appropriate for deciding a motion for summary judgment. . . .Instead, the court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.

<u>Id.</u> at 327, 329, 330, 331-32 (footnotes omitted).

For her factual innocence claim, the amended petition attaches three volumes of materials that contain Petitioner's medical records, including a report of Dr. William Bernet, a psychiatrist, affidavits of Petitioner, her mother and her ex-husband and some brief correspondence with Petitioner's trial counsel. All of these materials relate to Petitioner's tragic personal history and medical history. At the sentencing stage of her trial, Petitioner, her sister and two doctors (one a clinical psychologist) testified on the same issues. <u>Harris</u>, 989 S.W.2d at 312-13.

The only possible "new" evidence is Dr. William Bernet's report. Dr. Bernet, a psychiatrist, evaluated Petitioner in 2001 and 2002. In his report, Dr Bernet concluded that Petitioner has a serious mental disorder with a dependency and submissiveness and she had been drinking at the time of the murder . (Docket Entry No. 35, Attachment thereto, Vol. I , Exhibit D at pp. 6-9). In Dr. Bernet's opinion, "the Defendant participated in the murder of the victim because she is dependent upon men and as a result followed the directions of Walter Smothers, " and "was significantly impaired in her ability to appreciate the wrongfulness of her conduct." Id. at pp. 8, 9-11, 12.

First, Dr. Bernet's medical opinion is not new. The Tennessee Supreme Court opinion reflects the testimony of Petitioner, her sister and two doctors (one of them a clinical psychologist) about Petitioner's tragic past, medical history and medical condition. <u>Harris</u>, 989 S.W.2d at 312-13. The evidence of Petitioner's drinking and drug use on the day of the murder was presented at trial.

32

Id. at 309.  The state trial record includes testimony of medical opinion that Petitioner was following the lead of other defendants in this offense.

> Based upon an interview and evaluation of the defendant on February 18, 1994, <u>Dr. Blair, a clinical psychologist, diagnosed the defendant as suffering from severe depression and post-traumatic stress disorder. Dr. Blair also testified that the defendant has substance dependence and some elements of a personality disorder. Dr. Blair opined that the defendant is passive and dependent and makes poor decisions.</u>

> Dr. Blair stated that the defendant had reported to her that she had been raped and had been sexually abused by the rapist since the age of twelve. The defendant reported the abuse to her parents but was not believed. According to the defendant's statement, the alleged perpetrator later admitted the abuse but was never prosecuted. Following the rape, Dr. Blair said the defendant began using various drugs and attempted suicide multiple times. Dr. Blair opined that the defendant participated in the murder of the victim because she is dependent upon men and, as a result, followed the directions of Walter Smothers

> <u>On cross-examination, Dr. Blair admitted that any post-traumatic stress that the defendant now suffers would not have impacted her actions on the night of the murder, July 30, 1993. Also, Dr. Blair conceded that the defendant's noncompliance with her parents' instructions could be considered inconsistent with her assessment of the defendant as a dependent personality.</u>

Id. at 313 (emphasis added).

Second, Dr. Bernet considered only a "[p]artial transcript of the trial" and his report lists only the trial testimony of Petitioner and Drs. Morson and Blair.  (Docket Entry No. 35, Attachment thereto, Vol. 1, Exhibit D at p. 2).  Dr. Bernet's evaluation did not consider the state court's findings based upon other witnesses's testimony about Petitioner's conduct that describes her active role in this felony murder.  As reflected in the Tennessee Supreme Court findings, according to Smothers, Petitioner initially shot the victim and the scientific evidence was that the firing was not accidental and a deliberate act was required to fire the weapon. "Smothers said that while the defendant was still holding the gun, Ramsey accelerated, causing the truck to jerk and the gun to discharge and

33

shoot the victim in the hip. ... Ballistics testimony at trial indicated that to fire the gun which was used to shoot the victim, a person would have to both pull back the hammer and press the trigger." Harris, 989 S.W.2d at 310. The Tennessee Supreme Court also stated its finding that Petitioner's request for the victim's heart led Smothers to cut out the victim's heart after which Petitioner kissed the heart. " Smothers admitted that he had removed the victim's heart, but said he had done so because the defendant had told him that she 'wanted his heart'. Smothers said that he, Ramsey, and the defendant had each held the victim's heart and pressed it to their lips." Id. at 311 (emphasis added). On day after the murder, Petitioner was wearing the victim's hat and sunglasses at a bar where the bartender described her as "more active" than usual. Id

The Tennessee Count of Criminal Appeals also found that: "Testimony indicated that appellant was an active participant in the events leading up to the victim's murder. Appellant began the whole ordeal when she stopped Brooks in the road that night. She admitted that afer Ramsey threw Brooks onto the ground, she hit him in the back several times and cursed him. In addition, she kept the gun trained on Brooks as he lay in the back of the truck. Although she denies having control of the gun when the first shot went off, Smothers testified that the first shot into Brooks' hip occurred while appellant was holding the gun on him. Appellant was clearly more than a mere facilitator." Harris, 1996 WL 654335 at *4 (emphasis added).

In the Court's view, a reliable assessment of Petitioner would require consideration of other testimony and facts about Petitioner's actual role in the murder. Dr. Bernet's failure to do so leads the Court to find his opinions about Petitioner unreliable. This conclusion would apply with equal

34

force to the quoted opinion of Dr. Morson,[6] whose opinions are cited by Petitioner. (Docket Entry No. 35, Amended Petition, Vol. I, Exhibit A). For example, Dr. Morson who testified at trial and on whom Petitioner relies, opined that Petitioner was a "very passive person" and he became concerned that she acted "unwillingly." Id. at p. 4. This opinion is contrary to the factual findings of two Tennessee appellate courts' findings and the trial judge that Petitioner was an active participant in this murder. Moreover, as to Dr. Bernet's opinion, mental evaluations years after the critical events or "well after trial" "lack the same relevance" as evaluations of the petitioner's competence prior to trial. Harries v. Bell, 417 F.3d 631, 636 (6th Cir. 2005).

For her procedural innocence claim, Petitioner's amended petition contains factual assertions from the state record as well as the three bound volumes attached to her amended petition. (Docket Entry No. 35, Attachment thereto, Vols. I through III). Petitioner's amended petition contains factual allegations that describe and quote purported testimony in the state proceedings, but Petitioner did not file the state transcripts nor request the Respondent to do so. In any event, the Court does not need the state transcripts because these factual materials are not new and the state record that was filed, affords an adequate basis to decide this issue.

On her procedural claim of actual innocence, Petitioner alleges that her trial counsel were ineffective and that her counsel "found her to be unhelpful because of her mental condition." (Docket Entry No. 35, Amended Petition at p. 47). Yet, Petitioner's submission reflects that Dr. Bernard O. Hudson, a private psychiatrist, deemed Petitioner competent to proceed to trial as well as to "advise counsel and participate in her own defense." (Docket Entry No. 35, Vol. 1 at Exhibit

---

[6]Dr. Morson lists his medical degree as "D.O." that usually designates a doctor of osteopathy. Dorland's Medical Dictionary at p. 558 (30th ed. 2003)

B at p. 1). Petitioner also told Dr. Hudson: "[s]he understands clearly the need for an attorney. She believes that she can work well with her present attorney and believes that he has been helpful to me and I trust him." Id. at 2. According to Petitioner's post-conviction appeal brief, Petitioner's trial counsel testified that prior to Petitioner's hospitalization, trial counsel "felt that [ Petitioner] had assisted her attorney's more in preparing her case than after her hospitalization which occurred shortly before trial." and that " [trial counsel] believed that she was able to adequately assist the attorneys in the trial." (Docket Entry No. 7, Addendum No. 8 at pp. 7-8). In the post-conviction proceeding, Petitioner testified that she understood the Miranda issue and the search issue in her case. Id. at p. 12. As noted earlier, the Tennessee courts rejected a claim that trial counsel were ineffective in their strategic decision not to object to the incomplete aggravating circumstance found by the jury.

Petitioner also asserts that her trial counsel did not pursue a "diminished capacity defense." (Docket Entry No. 35, Amended Petition at pp. 35, 37). First, under Tennessee law "diminished capacity" is not a defense, but "refers to evidence negating the mens rea element of a crime, such as premeditation or malice." State v. Phipps, 883 S.W.2d 138, 143 (Tenn. Ct. Crim. App. 1994). Second, the Tennessee Supreme Court has stated that "evidence should not be proffered as proof of 'diminished capacity.' Instead such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish he criminal offense for which the Defendant is being tried." State v. Hall, 958 S.W.2d 679, 690 (Tenn. 1997).

At the time of Petitioner's trial, Tennessee law on "diminished capacity" was "sparse on the scope and applicability" of diminished capacity doctrine. Phipps, 883 S.W.2d at 143. At the time of Petitioner's trial, the Tennessee Court of Criminal Appeals had affirmed the denial of a jury

36

instruction on diminished capacity. Id. at 146, citing State v. Croscup, 604 S.W.2d 69, 72 (Tenn Ct. Crim. App. 1980). Phipps, that Petitioner relies upon recognized: "Tennessee law does not require the trial judge to instruct the jury that expert testimony may be considered in determining whether the requisite mental state existed. Our holding is not so broad.". 883 S.W. at 151. Clearly by the proof at sentencing, Petitioner's counsel had prepared and presented this proof about Petitioner's personal history and her mental condition. Given the State's proof, Petitioner's trial counsel made a strategic decision to present this proof at sentencing to save the petitioner from the death sentence. Such a strategic decision of counsel is not ground for habeas relief.

Petitioner also cites her absence at a suppression hearing, but in the Sixth Circuit, such personal presence is not constitutionally required. Yates v. United States, 418 F.2d 1228, 1229 (6th Cir. 1969). Accord, United States v. Burke, 345 F.3d 416, 426 (6th Cir. 2003)

As to the Petitioner's claim that she was only facilitating a felony that issue was addressed by the Tennessee Court of Criminal Appeals.

> Next, appellant argues that the trial court should have charged the jury on criminal facilitation after instructing the jury on criminal responsibility. Her contention is that it was warranted as a lesser offense. It is a well settled principal of law that an instruction on a particular charge must be given to the jury only if evidence in the record would support a conviction for the lesser offense. State v. Trusty, 919 S.W.2d 305, 311 (Tenn. 1996) (citations omitted). See also State v. Hicks, 835 S.W.2d 32, 36 (Tenn. Crim. App. 1992) (instruction on criminal facilitation should be given where its application is fairly raised by the evidence). Where there is no proof in the record which would support the instruction, a defendant is not entitled to the instruction. The record is devoid of any evidence to support a conviction for criminal facilitation and no instruction was warranted. (emphasis added).

> Under our criminal statues, "a person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under Section 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of a felony." Tenn. Code Ann. § 39-11-403(a) (1991). In contrast however, the record before us in replete with evidence to support the appellant's principal role in the crime.

(Docket Entry No. 7, Addendum No. 2, Opinion at pp.9-10. (emphasis added).

Based upon the constitutional standards discussed _infra_, this Court concludes that Petitioner's submissions do not show that trial counsel were so ineffective as to cast doubt on the outcome of her trial. In this regard, the Court notes the comments of the state trial judge who presided at Petitioner's trial, on the Petitioner's motion to reopen that also contained selected excerpts of the state court record.

> This Court is constrained to observe that within the various pleadings filed in support of this motion there is to be found a subtle selection of certain facts, an ignoring of others, and self-serving [conclusory] statements based upon purported facts, all of which could leave one unfamiliar with this matter with the impression that the movant was a victim in this case. This is not only grossly incorrect, but patently untrue. <u>The facts of this case reveal an incredibly obscene crime that would not and indeed, could not have occurred without knowing and willing participation, if not leadership, of the movant at every significant stage.</u>

(Docket Entry No.40, Addendum No. 12 thereto at p. 4). (emphasis added).

The Court concludes that the Petitioner has not made a showing of "reliable new evidence" to invoke the actual innocence exception so as to toll the limitations period on her untimely claims in her original or amended petition nor does Petitioner lead the Court to lack confidence that this cited evidence would undermine the jury's verdict.

### 3. Petitioner's Exhausted Claims

Petitioner's viable habeas claims, if timely, are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

38

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. <u>Id.</u> The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. <u>Id.</u> at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court conviction became final." <u>Id.</u> at 390; accord, <u>Joshua v. DeWitt</u>, 341 F.3d 430, 436 (6th Cir. 2003). In <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." <u>Id.</u> at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." <u>Mitchell v. Mason</u>, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

39

The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," Williams, 529 U.S. at 409, and a district court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

Petitioner's first claim is that she is actually innocent of the offense. Actual innocence can excuse procedural defaults and can justify equitable tolling, but is not an independent basis for habeas relief. Herrera v. Collins, 506 U.S. 390, 400 (1993). ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings. . . .This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact.") (citations omitted). This claim fails to state a basis for habeas relief.

The Petitioner's first actionable exhausted claim is that the Petitioner's trial counsel were ineffective for failing to object the jury's incomplete and invalid finding of an aggravated circumstance to justify the verdict. This claim was presented and decided as a federal claim in Petitioner's post-conviction proceeding by the Tennessee Court of Criminal Appeals.

> Petitioner asserts she received ineffective assistance of trial counsel due to their failure to object to an incomplete aggravating circumstances reported by the jury.

\* \* \*

40

At the post-conviction hearing, the petitioner's trial attorney testified that they made a conscious tactical decision not to object to the incomplete aggravating circumstances. <u>They testified that had they objected, the trial court would have simply sent the jury back to make a complete finding. Accordingly, they thought that raising the issue on direct appeal was the best course of action.</u>

<u>Tactical decisions by counsel are generally not proper subjects of post-conviction relief.</u> Henley, 960 S.W.2d at 579. <u>Regardless, we conclude the petitioner failed to prove prejudice. On direct appeal, the Supreme Court of Tennessee noted that the petitioner advanced no specific argument demonstrating that the jury grossly abused its discretion of imposing a sentence of life without the possibility of parole simply because the jury relied upon the incomplete aggravating circumstances.</u> Harris, 989 S.W.2d at 317. We similarly conclude in this post-conviction matter that petitioner has failed to establish a reasonable probability that the sentence would have been any different had counsel objected and the jury redeliberated. See <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. at 2068. This issue is without merit.

2001 WL 892848 at 1, 3. (emphasis added).

The Sixth Circuit summarized Supreme Court precedents and identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at a critical stage of the proceeding for which a presumption of prejudice arises; and (2) counsel whose performance was deficient on specific issues and that deficiency was demonstrably prejudicial to the defendant. As that Court explained:

In <u>United States v. Cronic</u>, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." . . . In <u>Williams</u>, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." <u>Williams</u>, 529 U.S. at 391(citing <u>Strickland</u>, 466 U.S. at 692, 104 S.Ct. 2052). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. <u>Olden</u>, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial).

41

Mitchell v. Mason, 325 F.3d 732, 740 (6th Cir. 2003).

Within the first category are three types of cases warranting the presumption of prejudice arising from counsel's acts or omissions:

> The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The second is when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 742.

In Carrier, the Supreme Court ruled that absent an error of constitutional magnitude, trial strategy decisions of counsel do not establish cause, unless the decision is of constitutional significance. Carrier, 477 U.S. at 486-88 (citing Engle v. Isaac, 456 U.S. 107, 133-34 (1982)). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute" prejudice. Id. at 486.

Here, from the review of the state court record, the Court concludes that Petitioner's ineffective assistance of counsel claim falls under the Strickland standard. As reflected in the quoted portions of the Tennessee Court of Criminal Appeals' decision, Petitioner's trial counsel's decision not to object to the jury's incomplete finding of aggravating circumstance was a strategic decision. Under Carrier, this strategic decision would not be actionable. The Tennessee Court of Criminal Appeals' decision on this issue is not unreasonable.

In addition, that state court also concluded that any deficiency in trial counsel's failure to object was not ground for relief due to Petitioner's lack of any showing of prejudice. To establish prejudice for counsel's errors or omissions, Petitioner must establish a reasonable probability that, but for counsel's unprofessional errors, the result of his trial would have been different. "A

42

reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id.

Given the facts in the state record and Petitioner's role in the offense, the Court cannot find the Tennessee's courts' finding on the lack of prejudice on counsel's failure to object to be unreasonable.

Petitioner's next exhausted claim is that Petitioner's conviction lacks an aggravating factor necessary for a life sentence without parole because Petitioner "did not kill the victim, did not know the victim was going to be killed, and did not even witness the killing. She was not told what the reason was for the killing. Only Smothers knows why he killed Mr. Brooks" (Docket Entry No. 35, Amended Petition at pp. 51-52). Petitioner cites Jackson v. Virginia, 443 U.S. 307 (1979).

To state a Fourteenth Amendment claim on insufficient evidence, in Jackson, the Supreme Court set forth the standard for reviewing the legal sufficiency of the evidence in support of a conviction.

> ...[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to `ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus

impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

Id. at 318-19 (emphasis added with footnotes and citations omitted).

A presumption of correctness obtains in determining whether there exists sufficient evidence to support a conviction. If any rational finder of fact would accept the evidence as establishing each essential element of the crime, this standard of review is satisfied. Id. at 324.

The Tennessee Supreme Court and the Tennessee Court of Criminal Appeals both found that Petitioner was an active planner and participant in this murder. Citing pertinent United States Supreme Court decisions on federal constitutional standards, the Tennessee Supreme Court found the evidence sufficient to support an aggravating circumstance for a life sentence without parole. Harris, 989 S.W.2d at 315-317. As the Tennessee Supreme Court stated:

> Clearly, one valid aggravating circumstance remains to support the defendant's sentence. The jury found proof beyond a reasonable doubt that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6) (1997 Repl.). The testimony of both the defendant and Smothers, who said that the victim was shot the second time because he began to scream for help as they drove into a populated area, support the jury's finding of this aggravating circumstance. The defendant offers no specific argument which demonstrates that the jury grossly abused its discretion by imposing a sentence of life imprisonment without the possibility of parole beyond her assertion that a new sentencing hearing is necessary because the jury relied upon the incomplete aggravating circumstance. Furthermore, nothing in the record suggests that the sentence was imposed arbitrarily so as to constitute a gross abuse of the jury's discretion. In sum, the defendant has failed to establish that the jury grossly abused its discretion by imposing a sentence of life imprisonment without the possibility of parole.

989 S.W.2d at 317.

This Court concludes that the Tennessee Supreme Court's ruling on this claim is not an unreasonable interpretation and application of relevant federal law.

Petitioner's next claim is that the trial court failed to give a jury instruction on the facilitation

44

of a felony. Under the Due Process Clause, jury instructions on lesser included offenses are required, but only if the evidence warrants a finding of guilt on the lesser included offense and an acquittal on the greater offense. See United States v. Levy, 904 F.2d 1026, 1031 (6th Cir. 1990). Here, the Tennessee courts found the evidence did not support such an instruction, given the Petitioner's active role in the murder. In this Court' review of the state record, this determination is not unreasonable.

### 4. Petitioner's Defaulted Claims

With the ruling on the related back doctrine and the merits of Petitioner's exhausted claims, Respondent contends that Petitioner's remaining claims[7] were not presented to the state courts as federal law claims:[8] (1)Petitioner claims of judicial bias at the suppression hearing; (2) Petitioner's claim of the lack of aggravating circumstances; (3) Petitioner's claim of improper prosecutorial argument about a pack; (4) Petitioner's claim that the trial counsel was ineffective for failing to request a diminished capacity instruction or to present a diminished capacity defense; and (5) Petitioner's claim for the trial court's failure to instruct the jury on facilitation of a felony. (Docket Entry No. 39 Respondent's Answer at pp. 13-14 17, 19, 21, 22 and 26). Respondent notes that Petitioner did not cite Beck v. Alabama, 447 U.S. 625 (1980) on direct appeal to Tennessee Court of Criminal Appeals. (Docket Entry No. 7, Addendum Nos. 3, and 8). Respondent also contends that the following claims were not presented to the state courts as part of Petitioner's claim of

---

[7]As noted earlier, supra n.1, the amended petition supercedes the original petition and only claims in the amended petition are before the Court. See also Luckett v. Turner, 18 F.Supp.2d 835, 837 n.2 (W.D. Tenn. 1998).

[8]Respondent also argues that Petitioner's claim of the lack of aggravating circumstances falls in this category. (Docket Entry No. 39, Respondent's Answer at p. 17). The Court disagrees after its review of the state record.

45

ineffectiveness for trial counsel's failures: (1) to address Petitioner's mental condition; (2) to present a diminished capacity defense and to request a jury instruction thereon; and (3) to object to the prosecutor's pack remark. (Docket Entry No. 89, Respondent Answer at pp. 16, 21, 25). Respondent contends that all of these claims are procedurally defaulted.

On Petitioner's direct appeal, the only claims that were supported by citation of federal law were: **(1)** that without the post-death evidence, the State's evidence would not support a sentence of life without parole, citing <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), (Docket Entry No. 7, Addendum No. 1, Appellant's Brief at p. 18); **(2)** the prosecutor's decision not to charge facilitation of a felony violated <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 364 (1978) (quoting <u>Oyler v. Boles</u>, 368 U.S. 448, 456 (1962), <u>id.</u> at p. 25; **(3)** that the Tennessee felony murder statute violates the Fifth, Sixth, Eighth and Fourteenth Amendments, <u>id.</u> at p. 25; **(4)** the prosecutor's improper comment "expounding ... vengence" violated <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985) and <u>Lesko v. Lehman</u>, 925 F.2d 1527 (3rd Cir. 1991) as well as the Eighth and Fourteenth Amendments, <u>id.</u> at p. 28; **(5)** that the trial court's bias favoring a state witness, violated the Eighth Amendment and the Due Process Clause citing <u>In re Murchinson</u>, 349 U.S. 133, 137 (1955) and <u>Public Utilities Comm. v. Pollak</u>, 343 U.S. 451, 466 (1952); <u>id.</u> at pp. 30-31; and **(6)** the police officers' interview of Petitioner violated her <u>Miranda</u> and her statements were involuntary in violation of the Fourteenth Amendment at pp. 31-42, citing several United States Supreme Court decisions. Of the State law decisions cited in this brief, none of those decisions is not demonstrated to rely upon federal law. In her post-conviction appeal to the Tennessee Court of Criminal Appeals, Petitioner cited <u>Strickland</u> and <u>Washington</u> on her ineffective assistance of counsel claim for failing to object to the jury's insufficient findings of an aggravating circumstance.

46

The Supreme Court defined the "Procedural Default Doctrine" for federal habeas proceedings as barring federal habeas relief in the certain instances:

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. <u>This rule applies whether the state law ground is substantive or procedural.</u> In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. <u>Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory.</u>
>
> * * *
>
> <u>The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on an independent and adequate state procedural ground.</u>

Coleman v. Thompson, 501 U.S. 722, 729-30 (1991) (emphasis added and citations omitted).

The rationale for this doctrine arises out of federal respect for federalism and maintaining comity with state courts:

> In the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without a rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.
>
> * * *
>
> [A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance. . . .In the absence of an independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the State's interest in correcting their own mistakes is respected in all federal habeas cases.

47

<u>Id.</u> at 730-32.

The Supreme Court further recognized that state procedural rules also serve a legitimate state interest in finality of criminal convictions:

> [p]lainly the interest in finality is the same with regard to both federal and state prisoners. ... There is no reason to ... give greater preclusive effect to procedural defaults by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations.

<u>Francis v. Henderson</u>, 425 U.S. 536, 542 (1976) (quoting <u>Kaufman v. United States</u>, 394 U.S. 217, 228 (1969)).

In <u>Murray v. Carrier</u>, 477 U.S. 478 (1986), the Supreme Court noted that state procedural rules channel the controversy to the state trial and appellate courts.

> A state's procedural rules serve vital purposes at trial, on appeal, and on state collateral attack... "Each state's complement of procedural rules ... channel[s] to the extent possible, the resolution of various types of questions to the stage of the judicial process at which they can be resolved most fairly and efficiently." . . . Failure to raise a claim on appeal reduces the finality of appellate proceedings, deprives the appellate court of an opportunity to review trial error, and "undercut[s] the state's ability to enforce its procedural rules."

<u>Id.</u> at 490-91. (quoting <u>Engle v. Isaac</u>, 456 U.S. at 129 and <u>Reed v. Ross</u>, 468 U.S. 1, 10 (1984)).

As the Sixth Circuit stated in <u>Williams v. Anderson</u>, 460 F.3d 789, (6th Cir. 2006), there are two types of procedural default:

> First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. <u>Lundgren v. Mitchell</u>, 440 F.3d 754, 763 (6th Cir. 2006) (citing <u>Washington v. Sykes</u>, 433 U.S. 72, 87, 97, S.Ct. 2497, 52 L.Ed.2d 594 (1977). <u>See</u> <u>also</u> <u>Maupin v. Smith</u>, 758 F.2d 135, 138 (6th Cir. 1986). If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted. <u>Id.</u>
>
> Second, a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's "ordinary appellate review

48

procedures." O'Sullivan v. Boerckel, 526 U.S. 838, 848-7, 110 S.Ct 1728, 144 L.Ed.2d (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted. Engle v. Isaac, 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); see also Coleman v. Thompson, 501 U.S. at 731-2, 111 S.Ct. 2546. This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts. AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." Engle, 456 U.S. at 125 n. 28 , 102 S.Ct. 1558. Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review. Id. . . .

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his or her claim. McMeans v. Brigano, 228 F.3d 674, 681 (6th Cir.2000). Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue-not merely as an issue arising under state law." Koontz v. Glossa, 731 F.2d 365, 368 (6th Cir.1984). A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." Newton v. Million, 349 F.3d 873, 877 (6th Cir.2003).

Id. at 806 (emphasis added).

An actual ruling on a claim presented to the state court is not required for federal habeas review. Smith v. Digmon, 434 U.S. 332, 333-34 (1978). Moreover, a petitioner is not required to present to the state court every specific fact which he presents to the federal court. Federal courts can consider supplemental evidence that was not presented to the state court if that evidence does not "fundamentally alter the legal claim already considered by the state courts." Vasquez v. Hillery, 474 U.S. 254, 260 (1986).

As noted earlier, supra at pp. 15-16, most of the claims asserted in the amended petition were raised for the first time in Petitioner's application for permission to appeal to the Tennessee Supreme

49

Court on the denial of her post-conviction petition. (Docket Entry No. 7, Addendum No. 10 at pp. i, ii). In <u>Castille v. Peoples</u>, 489 U.S. 346. 350 (1989), the Supreme Court considered a similar issue where the habeas petitioner first presents his federal claims in the state's highest court in a permissive appeal. In <u>Castille</u>, the habeas petitioner presented claims in a motion for allocatur in the Pennsylvania Supreme Court, but had not presented those federal claims in the lower state courts. The Supreme Court stated "where the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless 'there are special and important reasons therefore,' ... [r]aising the claim in such a fashion does not for the relevant purpose, constitute 'fair presentation.'" <u>Id.</u> at 351 (citations omitted).

Here, <u>Castille</u> controls in that Petitioner's Rule 11 application is a permissive petition wherein the party seeks further judicial review by the State's highest court, but the merits are not decided because the only issue on such an application is whether the Tennessee Supreme Court should review the merits and which issues may be selected by the state's highest court. Thus, the Court concludes that Petitioner's federal claims in her Rule 11 application were not fairly presented to the state courts and are therefore subject to procedural default.

As to Petitioner's other claims that were purportedly not presented to the state courts as federal claims, Petitioner did cite <u>Furman</u> on the sufficiency of her aggravating circumstance claim that was resolved and discussed earlier by the state courts. Petitioner did not cite <u>Beck v. Alabama</u>, 477 U.S. 625 (1980) on any jury instructions claim in the state courts. Therefore, the Court concludes that Petitioner's jury instruction claim based upon <u>Beck</u> was not fairly presented to the state courts. The Court also finds that none of the Petitioner's additional claims about ineffective counsel were presented to the state courts. In summary, after review of the Petitioner's claims in

50

the state courts and her amended federal petition, the Court concludes that beyond the claims actually decided on the merits by the state courts, Petitioner's remaining claims are subject to the procedural default defense.

The Sixth Circuit defined the analysis under procedural default doctrine in <u>Maupin v. Smith</u>, 785 F.2d 135, 138 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> * * *
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction.
>
> * * *
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

<u>Maupin</u>, 785 F.2d at 138 (citations omitted).

Here, where the habeas petitioner presents claims that were not presented to the state courts and the procedural default defense is raised, the district court must consider if the state courts would bar review of those claims. See <u>Engle v. Isaac</u>, 456 U.S. 107, 125-26 n.28 (1982). Here, the state trial court denied Petitioner's motion to reopen based, in part, upon the state's one year limitation period for post-conviction petitions. (Docket Entry No. 40, Addendum 12 thereto). Now, if these new claims were pursued in the state courts, Petitioner's remaining claims would be subject to the one year limitation period in Tenn. Code Ann. § 40-30-102 (2006). The Court must therefore

51

consider whether the one year limitation period for state post-conviction petitions would qualify for the application of the procedural default doctrine.

To qualify for the procedural default rule, any state rule must be firmly established and regularly followed at the time the claim arose. Ford v. Georgia, 498 U.S. 411, 423-24 (1991). As the Sixth Circuit explained, "[c]onsiderations of comity do not require a federal court to abstain from deciding a constitutional claim on grounds of procedural default where the state courts have not enforced a given state procedural rule." Rice v. Marshall, 816 F.2d 1126, 1129 (6th Cir. 1987).

In Hutchison v. Bell, 303 F.3d 720 (6th Cir. 2002), the Sixth Circuit analyzed Tennessee's statute of limitations statute on post-conviction petitions and its Burford exception in a procedural default challenge:

> Hutchison argues that Tennessee courts' willingness to excuse procedural default pursuant to Burford demonstrates that state procedural rules are not regularly followed in the context of later-arising claims. . . .
>
> Nevertheless, we agree that Tennessee's due process exception does not render this provision inadequate. Tennessee's due process exception does not grant unfettered discretion to state courts in applying procedural default rules. Although Tennessee courts will often permit the hearing of an untimely claim, the decision is confined by the due process standards delineated in Burford and its progeny. The Tennessee courts consistently enforce a procedural scheme that encompasses both the one-year limitations period and a court-recognized procedure for tolling that statute when specific due process grounds are presented . . .
>
> In Hannah v. Conley, 49 F.3d 1193 (6th Cir. 1995) (per curiam), this Court found that the then-applicable three-year statute of limitations for post-conviction petitions in Tennessee was regularly applied and would bar presentation of an unexhausted claim. Id. at 1197. The Hannah court noted that the language of the statute was mandatory in that it provided that a claimant "must" petition within three years or his claim "shall" be barred. Id. at 1196. The current one-year statute of limitations contains the same mandatory language. See T.C.A. § 40-30-202(a).
>
> Although the previous cases did not present a Burford-type later arising claim, we do not find that the state's Burford tolling rules command a different result. . .

Given that tolling under Burford is not discretionary and given this Circuit's reluctance to discourage state courts from exhibiting caution before applying procedural default rules in capital cases, <u>we conclude that the Burford exception does not render Tennessee's procedural rules inadequate.</u>

<u>Id.</u> at 738-739. (emphasis added with footnote and citations omitted).

Based upon <u>Hutchison</u>, the Court concludes the Tennessee limitations statute for post-conviction petition constitutes a firmly established and regularly followed state rule.

### c. Independent and Adequate State Rule

As to what is an independent and adequate state rule, the Supreme Court recognized the following state interests as constituting adequate grounds for state procedural rules. "[T]he possible avoidance of an unnecessary trial or of a retrial, the difficulty of making factual determinations concerning grand juries long after the indictment has been handed down and the grand jury disbanded, and the potential disruption to the numerous convictions of finding a defect in a grand jury only after the jury has handed down indictments in many cases." <u>Coleman</u>, 501 U.S. at 745-46. Another reason to support a finding of adequate state rules was articulated in <u>Francis v. Henderson</u>, 425 U.S. 536 (1976), wherein the Supreme Court enforced a state rule that promoted finality, noting a comparable federal rule.

"Plainly the interest in finality is the same with regard to both federal and state prisoners ... There is no reason to ... give greater preclusive effect to procedural defaults by federal defendants than to similar defaults by state defendants. To hold otherwise would reflect an anomalous and erroneous view of federal-state relations."

<u>Id.</u> at 542 (citation omitted).

In <u>Coleman</u>, the Supreme Court upheld a procedural rule that bars consideration of a federal claim for failure to meet state law requirements for timely appeals. 501 U.S. at 750-51. "'No procedural principle is more familiar to this court than that a constitutional right may be forfeited

53

in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it'. . . No less respect should be given to state rules of procedure." Id. at 751 (quoting Yakus v. United States, 321 U.S. 414, 444 (1944). Accord Brown v. Allen, 344 U.S. 443, 485-86 (1953) (procedural default rule applied a state rule that placed time limits on appellate rights).

Based upon Coleman, Cone and Hutchison, the Court concludes that Tennessee's limitations period for post-conviction petition is an independent and adequate state rule that promotes the timely presentation of claims.

### d. The Cause and Prejudice Requirement

Once the respondent establishes procedural default, the burden shifts to the petitioner to show cause for the procedural default and actual prejudice or that the Court's failure to consider the claim will result in a miscarriage of justice by the conviction of one who is actually innocent. Coleman, 501 U.S. at 753. Cause for a procedural default must depend on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. Id.

> We think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule. Without attempting an exhaustive catalog of such objective impediments to compliance with a procedural rule, we note that a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that `some interference by officials,' Brown v. Allen, 344 U.S. 443, 486 (1953), made compliance impracticable, would constitute cause under this standard.

Carrier, 477 U.S. at 488 (citation omitted).

Inadequate defense counsel can prove cause, but only if counsel's conduct violates Sixth Amendment standards and counsel's inadequate conduct has been presented to the state courts.

So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in <u>Strickland v. Washington</u>, <u>supra</u>, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default.

\* \* \*

<u>Similarly, if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not "conduc[t] trials at which persons who face incarceration must defend themselves without adequate legal assistance."</u> <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 344 (1980). Ineffective assistance of counsel, then, is cause for a procedural default. However, we think that the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," <u>Rose v. Lundy</u>, 455 U.S. 509, 518 (1982), generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. The question whether there is cause for a procedural default does not pose any occasion for applying the exhaustion doctrine when the federal habeas court can adjudicate the question of cause---a question of federal law---without deciding an independent and unexhausted constitutional claim on the merits. <u>But if a petitioner could raise his ineffective assistance claim for the first time on federal habeas in order to show cause for a procedural default, the federal habeas court would find itself in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available. The principle of comity that underlies the exhaustion doctrine would be ill-served by a rule that allowed a federal district court "to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," Darr v. Burford, 339 U.S. 200, 204 (1950), and that holds true whether an ineffective assistance claim is asserted as cause for a procedural default or denominated as an independent ground for habeas relief.</u>

<u>Carrier</u>, 477 U.S. at 488-89 (emphasis added).

The Supreme Court emphasized in <u>Coleman</u> that mere attorney error cannot be cause and cannot be attributable to the state.

Attorney ignorance or inadvertence is not "cause" because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must "bear the risk of attorney error." ... Attorney error that constitutes ineffective assistance of counsel is cause, however ... as <u>Carrier</u> explains, <u>"if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State."</u>

55

[quoting Carrier, 477 U.S. at 488]. In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i.e., "imputed to the State."

Coleman, 501 U.S. at 753-54 (emphasis added).

In Carrier, the Court reviewed its precedents on the various acts of a petitioner's trial and appellate counsel that may constitute cause. In Engle, the Court ruled that absent an error of constitutional magnitude, trial strategy decisions of counsel could not establish cause, 456 U.S. at 133-34, unless the decision is of constitutional significance. Carrier, 477 U.S. at 486-88. In Carrier, the Supreme Court made it clear that procedural defaults attributed to ignorance or the inadvertence of counsel or as a result of a deliberate appellate strategy that fails to raise a "particular claim" would preclude federal habeas review of a claim. 477 U.S. at 487. "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural default." 477 U.S. at 486. As to the failure to raise a claim on appeal, the Court also observed that "[t]his process of `winnowing out weaker arguments on appeal and focusing on" those more likely to prevail, far from being evidence of incompetence is the hallmark of effective appellate advocacy. Murray, 477 U.S. at 527, 536 (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983).

Moreover, to serve as cause, the specific ineffective assistance of counsel claim must itself not be subject to procedural default absent a showing of a miscarriage of justice and/or a showing of cause and prejudice for that claim. Edwards v. Carpenter, 529 U.S. 446, 448, 453 (2000) ("To hold, as we do, that an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted is not to say that procedural default may not *itself* be excused if the prisoner can satisfy the cause-and-prejudice standard with respect to *that*

56

claim.") (emphasis in the original).

In Wainwright v. Torna, 455 U.S. 586 (1982), the Supreme Court made it clear that ineffective assistance of counsel cannot be grounds for cause where counsel was not constitutionally required for the proceeding in which the error occurred. Under Ross v. Moffitt, 417 U.S. 600 (1974) and Pennsylvania v. Finley, 481 U.S. 551 (1987), the right to counsel does not extend beyond the first appellate process. Thus, counsel errors in state post-conviction proceedings are not grounds for cause because there is no right to counsel for these proceedings. Ritchie v. Eberhart, 11 F.3d 587, 591-92 (6th Cir. 1993). The habeas statutes codified this rule. 28 U.S.C. § 2244(i).

Here, Petitioner's remaining ineffective assistance of counsel claims are procedurally defaulted. From the review of the state court record, the Court concludes that Petitioner's exhausted ineffective assistance of counsel claims lack merit. As a matter of law, any omissions or errors of Petitioner's state post-conviction counsel cannot establish cause for any procedural default.

Even if Petitioner could establish cause, Petitioner must also establish prejudice due to her counsel's errors or omissions and a reasonable probability that, but for counsel's unprofessional errors, the result of her trial would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id. The Court agrees with the Tennessee courts that Petitioner has not made any showing of prejudice.

For these collective reasons, the Court concludes that the petition should be denied.

An appropriate Order is filed herewith.

57

**ENTERED** this the 30th day of March, 2007.

William J. Haynes Jr.
WILLIAM J. HAYNES, JR.
United States District Judge